THE CITY OF NEW YORK, Plaintiff, *v.* FIFTH AVENUE COACH COMPANY, Defendant.*

First Department, January 17, 1933.

* Affd., 262 N. Y. ——.

**384**

*Joseph A. Devery* of counsel [*William E. C. Mayer* with him on the brief; *Arthur J. W. Hilly, Corporation Counsel*], for the plaintiff.

*Frederick H. Wood* and *Royal E. T. Riggs* of counsel [*Edward S. Pinney* with them on the brief; *Cravath, deGersdorff, Swaine & Wood* and *Seibert & Riggs*, attorneys], for the defendant.

MERRELL, J. The parties are in dispute with respect to the validity of certain franchises or rights claimed and now being exercised by the defendant to operate its bus lines on certain streets of the city of New York. The questions in dispute may be summarized as follows:

1. Has the defendant a valid franchise or right to operate stages or omnibuses on the routes specified in the certificates made by the Board of Railroad Commissioners and Public Service Commission for the First District specified in the exhibits annexed to the submission, or any of them?

2. If the foregoing question be answered in the negative, is the plaintiff entitled to an injunction restraining the defendant from operating stages or omnibuses on and along said routes, or any of them?

The plaintiff contends:

(1) That chapter 657 of the Laws of 1900, pursuant to which said certificates were made, is unconstitutional and void because enacted in violation of article 3, section 16, and article 12, section 2, of the Constitution of the State of New York.*

(2) That, assuming said act of 1900 to be constitutional, it did not empower the Board of Railroad Commissioners and the Public Service Commission for the First District to authorize the operation of stages or omnibuses on the routes specified in said certificates, without the consent of the local authorities of the city of New York or the consent of a majority of the property owners in or upon the streets comprising said routes.

(3) That, assuming said act of 1900 to be constitutional and to have superseded the provisions of law requiring the consents of local authorities or property owners to the operation of stage or omnibus routes in the city of New York, it was itself superseded by chapter 629 of the Laws of 1905, which amended section 242 of the Greater New York Charter.

The defendant challenges all of the said contentions of plaintiff numbered 1, 2 and 3 above. The defendant contends:

(a) That chapter 657 of the Laws of 1900 was neither a private nor local bill within the meaning of article 3, section 16, of the Constitution of the State of New York, and was not violative of said Constitution.

(b) That section 1461 of the Greater New York Charter, as amended by chapter 466 of the Laws of 1901,† ratified and confirmed the acts of the Board of Railroad Commissioners with respect to the certificates of 1900 and 1901.

(c) That the judgment entered in the Supreme Court, New York county, in City of New York v. Fifth Avenue Coach Co. (Exhibit 23 hereof) is *res adjudicata* with respect to the validity of all said certificates.

(d) That the parties have practically construed the act of 1900 as a valid enactment; that the plaintiff is estopped from questioning the validity of said act and that the plaintiff is barred because of laches or by the provisions of sections 53 and 54 of the Civil Practice Act from seeking to enjoin the operations of the defendant under said certificates or any of them.

(e) That the said certificates, accepted and acted upon by the defendant, constitute contracts which may not be impaired without violating the provisions of article 1, section 10, of the Constitution of the United States, or property of which the defendant may not be deprived without due process of law, under article 1, section 6,

---

* Const. of 1894.—[REP.     † Repealed by Laws of 1913, chap. 769.—[REP.

of the Constitution of the State of New York and the Fourteenth Amendment of the Constitution of the United States.

The plaintiff contends to the contrary, with respect to all of the contentions of the defendant lettered a, b, c, d and e above.

The plaintiff prays that this court adjudge and decree:

(1) That the said certificates of the Board of Railroad Commissioners and Public Service Commission for the First District (Exhibits 3, 6 and 15 hereof) are unauthorized, illegal and void and that the operation of stages or omnibuses by the defendant under color of said certificates is unauthorized and illegal.

(2) That the defendant, its officers, agents, employees and all persons acting on its behalf be perpetually enjoined and restrained from operating stages or omnibuses on the routes specified in said certificates and all of them.

(3) That the plaintiff have such other and further relief with respect to such routes as to the court may seem proper.

The defendant prays that this court adjudge and decree:

(aa) That it has franchises or rights to operate in perpetuity the routes specified in said certificates of the Board of Railroad Commissioners and Public Service Commission for the First District (Exhibits 3, 6 and 15 hereof).

(bb) That the prayer of the plaintiff for an injunction restraining the operation of the said routes should be dismissed upon its merits.

The statute pursuant to which the franchises in dispute were granted is known as chapter 657 of the Laws of 1900, by which the Transportation Corporations Law (Laws of 1890, chap. 566), a general law, was amended by the addition thereto of a new section numbered 23.*

This act, in form a general one, permitted any corporation incorporated under any law of the State of New York theretofore enacted, which owned and operated a lawfully established stage route, continuously operated " for five years last past in any city of the first class," to extend its existing routes at any time and to operate same by electricity or any other motive power, merely by obtaining a certificate of approval from the Board of Railroad Commissioners, and " without further or other authority, proceeding, or consent required under any act, general, public, private or local." Upon compliance with this procedure and operating the extension, the corporation was permitted to charge a fare " not exceeding ten cents per passenger " and required to pay a license fee for each omnibus and five per cent of its gross receipts " to the city in which it operates."

---

*Now Transp. Corp. Law, § 23.— [REP.

Under the law thus enacted the defendant, Fifth Avenue Coach Company, applied to the Board of Railroad Commissioners for a certificate of approval, and, after " a public hearing " held by the Railroad Commissioners in the city of New York, this application was granted, " no one appearing in opposition thereto."

Subsequently, under date of February 7, 1901, the company applied to the Board of Railroad Commissioners, under the act of 1900, for a certificate of approval to further extensions of routes, which, after " a public hearing," was also granted, " no one appearing in opposition thereto."

Again, in 1912, under the act of 1900, the company added short extensions, about a mile in length, connecting its Fifth Avenue route with the Pennsylvania Terminal. A certificate of approval was obtained from the Public Service Commission for the First District, which had meanwhile succeeded to the powers of the Board of Railroad Commissioners. It appears from the reports of the Public Service Commission for the First District that a " hearing was held by the Commission on this application which was opposed by counsel for another omnibus company."

In 1913 (Laws of 1913, chap. 769) an amendment was made to the Greater New York Charter* which provided that " no stage or omnibus route or routes for public use, or any alteration or extension thereof, or any alteration or extension of any existing stage or omnibus route, shall hereafter be put in operation    *    *    *    within the city of New York " unless a franchise be obtained from the board of estimate and apportionment and subject to the limitations and conditions contained in the charter with respect to franchises.

Between 1916 and 1927 the board of estimate and apportionment granted to the company a number of permits, revocable at the pleasure of the board, for the temporary operation of various routes, none of which included the " certificate " routes. All of these permits were substantially similar in form and contained a clause which carefully preserved the rights of the city with respect to the " certificate " routes. This clause recites: " This consent is granted on the further condition that it shall not be construed or deemed to recognize in or give to the Company any right or claim other than the permission hereby granted, the status of the City and the Company and its franchise rights, if any, to remain entirely unaffected by the granting or acceptance hereof."

We are of the opinion that chapter 657 of the Laws of 1900 was not a private or local bill within the meaning of article 3, section 16, of the Constitution of New York. That section reads:

---

* Section 1458, added.— [Rep.

" No private or local bill, which may be passed by the Legislature, shall embrace more than one subject, and that shall be expressed in the title."

It is not so palpable a device on its face as to evade constitutional limitations.

Unless an act, general in its terms, is palpably on its face such a device, it will be sustained, although in practical effect it is restricted in its application to but a few situations or even a single one. (*Matter of N. Y. Elevated R. R. Co.*, 70 N. Y. 327.)

The city contends that the act in question is a local bill within the provisions of section 16 of article 3 of the Constitution of the State of New York, and, being a local bill, that it embraces more than one subject. We cannot agree with such contention. We think the act is clearly a general one, applicable generally to municipalities of the State of New York. The city particularly stresses the provision of the act making it applicable to a corporation owning and operating a lawfully established stage route which has been continuously operated by it or its predecessors in title " for five years last past " in any city of the first class, contending that at the time of the passage of the act there were but two cities of the first class in the State, namely, the city of New York and the city of Buffalo, and that the five-year period refers to a period immediately preceding the passage of the act. In our opinion the five-year period of operation does not refer to the passage of the act, but refers to the period prior to the application for and the granting of the franchise. We are not required to construe the act as limiting its application to a case where a corporation which is granted a franchise has owned and continuously operated " for five years last past " a stage route in a city to the five-year period immediately preceding the passage of the act. On the contrary, it seems to us that the reasonable interpretation of the language of the statute should be that the five-year period in which it must appear that the applicant had operated a stage coach route in a city of the first class meant the five years immediately preceding such application. We think the construction for which the city contends would render the act meaningless, and that after its enactment there might be no further application for a franchise, except in the two cities of the State in the first class, viz., New York and Buffalo. It might well be that in time other centers of population might rise to the status of cities of the first class, as, indeed, they have in the cases of the cities of Rochester and Syracuse. A reasonable interpretation of the act would seem to require such an interpretation as would permit the granting of franchises to applicants in such last-mentioned cities. If this were not true, why did not the

Legislature make the act applicable to the cities of the first class *as they then existed*, or, indeed, specify that the act applied to applications of corporations operating stage routes in the cities of New York and Buffalo?

In support of the contention of the defendant in this respect, it urges that where the language of the statute is capable of an interpretation reconcilable to the Constitution, such interpretation should be adopted. In 1900 and again in 1901 and still later in 1912, the defendant applied for certificates of approval of certain routes over which it sought to extend the operation of its buses, and such certificates of approval were issued to it by the duly constituted authorities, in 1900 and 1901 by the Board of Railroad Commissioners, and in 1912 by the Public Service Commission, which, under the amendment, had succeeded to the powers of the Board of Railroad Commissioners. In all of the certificates so granted to the defendant there were recitals that due proof had been presented that the defendant and its predecessor in title owned and operated a lawfully established stage route which had been continuously operated by it and its predecessor for five years then last past. Thus, under the certificate of approval issued to the corporation by the Board of Railroad Commissioners on February 21, 1901, the certificate contained the following recital: " and due proof being given that said company and its predecessors in title now own and operate and have continuously owned and operated *for more than five years last past* a lawfully established stage route in the Borough of Manhattan, City of New York" (Italics are the writer's), and in the order and certificate of approval of the proposed extension of defendant's route upon Fifth avenue made by the Public Service Commission for the First District on April 19, 1912, there was the following recital: " and due proof having been given that said Fifth Avenue Coach Company is duly incorporated under the laws of the State of New York and owns and operates a lawfully established stage route upon Fifth Avenue in the City of New York which has been continuously operated by said company or its predecessors in title to such route *for five years last past.*" (Italics are the writer's.) Certainly, in granting said orders and certificates of approval, the duly constituted authorities interpreted the five-year period of continuous operation of the stage route to refer, not to the five-year period prior to the passage of the statute, but rather to the five-year period prior to the granting of the application. Such recitals, to our minds, are the strongest evidence of an interpretation of the statute made by the Boards granting the same.

The act in question did not constitute the direct grant of a

franchise to any person but conferred authority upon the Board of Railroad Commissioners, within its discretion, to grant franchises to any persons of a designated class within any city of the first class. It was thus public in purpose and general in application.

The right to grant franchises resides in the Legislature alone. It may exercise this power directly or delegate the same either to a State agency, such as the Board of Railroad Commissioners, or to a municipality.

An act is no less public because the number of persons who, then or thereafter, may avail themselves of the jurisdiction conferred, be few or limited to but a single person. (*Matter of N. Y. Elevated R. R. Co.*, supra; *Matter of Buffalo Traction Co.*, 25 App. Div. 447; affd., 155 N. Y. 700; *People ex rel. Clauson* v. *Newburgh, etc., Plank Road Co.*, 86 id. 1.)

The act, on its face, was, therefore, merely the exercise of the Legislature's unquestioned right to delegate such part of its sovereign power to grant franchises within any city of the first class to such agency of its own choosing as it saw fit to name for the purpose.

The plaintiff, to sustain its contention that chapter 657 of the Laws of 1900 is unconstitutional, relies largely on the decision of the Court of Appeals in *Matter of Henneberger* (155 N. Y. 420). We do not think that case is at all decisive of the question presented, and is clearly distinguishable from the case at bar. As the Court of Appeals itself in effect stated in the *Henneberger* case, that case did not and was not intended to overrule certain prior decisions of that court. (*Matter of N. Y. Elevated R. R. Co.*, supra; *Matter of Church*, 92 N. Y. 1; *People ex rel. Clauson* v. *Newburgh, etc., Plank Road Co.*, 86 id. 1.)

That the Court of Appeals did not intend to modify the principle laid down in the cases last above cited plainly appears from the opinion in the *Henneberger* case, wherein Judge GRAY, writing for the Court of Appeals, said (at p. 429): " The classification of cities by population is an idea recently embodied in the Constitution, and good reasons exist why, in a general law, reference may be had to conditions of population, whether in counties, cities, towns or villages, or with respect to a proximity to cities of a certain growth. *We shall adhere to the rule, now settled, that an act embracing all things of a certain class is a general and not a local act; although, by reason of some limitation, based on population or other condition, only a particular locality can, in the actual situation, receive its benefits* [*Ferguson* v. *Ross*, 126 N. Y. 464]; but, when restriction is imposed upon restriction, until, as in the present case, its generality is hidden and impossible, the courts should not hesitate to adjudge its invalidity. * * * " (Italics are the writer's.)

In *Matter of N. Y. Elevated R. R. Co.* (70 N. Y. 327) the validity of section 36 of the Rapid Transit Act of 1875 was involved. That act provided for the granting of franchises for the extension of the road of an " elevated steam railway or railways *now* in actual operation." It was urged that the act in question was unconstitutional under section 18 of article 3 of the Constitution, which forbade the passage of any private or local bill granting to any corporation the right to lay down railroad tracks. It was contended, *first*, that the act was invalid because it was applicable only to existing elevated railroads; and, *second*, because, since there was, at the time, but one such railroad, it could never apply to any other or to anything but a single locality. The Court of Appeals in that case sustained the constitutionality of the act. Judge EARL, writing for the Court of Appeals and in reciting the facts, stated (at p. 347): " No railway company could have the benefit of these provisions except it had an elevated railway in actual operation at the time of the passage of the act, * * *." And further (at p. 351) Judge EARL wrote: " It seems to be conceded by the learned counsel for the appellants that such a law would be general, if it applied to both existing companies, and such as should thereafter be formed. But I am unable to perceive why a law applicable to existing and future companies should be general, and one confined to existing companies not general. Both laws would, at the time of their enactment, apply to precisely the same existing subjects, and until future companies came into existence, would have precisely the same operation." Having thus overruled the contention that an act regulating the granting of franchises limited in its application to existing corporations was invalid, the Court of Appeals then proceeded to meet the claim that the act was invalid because of the fact that, although general in its terms, the act was invalid because it applied to a single corporation. The Court of Appeals held that the act was applicable to any corporation of the class described. Judge EARL (at p. 351) further wrote as follows: " *But it is claimed that there was but one elevated railway in actual operation at the time of the passage of the act, and hence that it must be deemed that the Legislature had sole reference to that.* It was well said by ALLEN, J., in *People ex rel. Bolton* v. *Albertson* (55 N. Y. 50), that ' no motive, purpose or intent can be imputed to the Legislature, in the enactment of a law, other than such as are apparent upon the face, and to be gathered from the terms of the law itself.' Another learned judge of this court has said: ' We are not made judges of the motives of the Legislature, and the court will not usurp the inquisitorial office of inquiring into the *bona fides* of that body in discharging its duties.' (*People ex rel. Wood* v. *Draper,* 15 N. Y. 532, 545, 555.)

*It is not to be presumed or inferred that the Legislature intended to violate or evade the constitutional restraints.  The law does not specify any particular elevated steam railway in actual operation, but in its terms applies to any and all such railways anywhere in operation. How are we to know that there was but one in operation at the time of the passage of the act?*  Can a court take proof for the purpose of showing a statute valid and regular upon its face to be unconstitutional?  And does the validity of a law which is required to be general, and which is general in its terms, depend upon the number of subjects upon which it can operate, or upon the size of a class to which it applies?  These questions must be answered in the negative.  *We do not know and we cannot assume that the Legislature knew that there was but one elevated steam railway in actual operation in this State, at the time of the passage of the act.*  There had been passed several acts under which such railways could have been constructed.  (Chap. 753 of the Laws of 1857; chap. 225 of 1867; chap. 794 of 1869; chap. 795 of 1870; chaps. 897, 940 of 1871; chaps. 505, 833 of 1872; chaps. 275, 443, 558, 585 of 1874.)  Under these laws and probably others, elevated steam railways of some length, could have been constructed.  *We cannot assume or know judicially that no railway under any of these acts was in operation.*  On the contrary we may assume that the Legislature found there was. [*Wellington* v. *Petitioners*, 16 Pickering, 87; *Morgan* v. *Monmouth Plank Road Co.*, 26 N. J. Law R. 109.]  \* \* \*."  (Italics are the writer's.)

The case of *Matter of N. Y. Elevated R. R. Co. (supra)* is a leading one on the subject of general and specific laws, and the decision of the Court of Appeals in that case has never been overruled, and has been repeatedly cited with approval, not only as defining what constitutes a general, as distinguished from a private or local, bill, but as pointing the way to such distinction by example.  In so far as section 16 of article 3 applies to acts governing the manner in which the Legislature may exercise its sovereign power to grant franchises, *Matter of N. Y. Elevated R. R. Co.* is a leading case on the subject.  On its face chapter 657 of the Laws of 1900 is no more restricted in classification than was the statutory provision under review in that case.  It could not have been more restricted in its principal application, however few the number of corporations which might avail themselves of the right to invoke the jurisdiction conferred upon the Board of Railroad Commissioners thereby, since the case was decided upon the ground that the challenged provision was valid even though immediately applicable to but a single corporation, and even though, because limited to a single corporation, it could never be applicable to any other.  We think

the Court of Appeals by its decision in *Matter of N. Y. Elevated R. R. Co. (supra)* pretty thoroughly disposed of the contention now urged by the city in attacking the constitutionality of chapter 657 of the Laws of 1900.

In *People ex rel. Clauson* v. *Newburgh, etc., Plank Road Co.* (86 N. Y. 1) the Court of Appeals held constitutional an act authorizing certain plank road or turnpike companies to extend their corporate existence. Judge EARL, in writing for the Court of Appeals in that case, said (at p. 6): " It is not every plankroad company which can have its charter extended under this act, but *only a company which owns a road,* which has been managed and *carried on for twenty years, upon three miles, or not less than one-third of the route of the road named in the original articles of association.* Other plankroad companies cannot avail themselves of this act." (Italics are the writer's.)

In *People ex rel. N. Y. Elec. Lines Co.* v. *Squire* (107 N. Y. 593) the Court of Appeals upheld the validity of an act defining the conditions under which companies carrying on a business requiring the use of electric wires or conductors in cities having a population of over 500,000 might construct conduits. In that case the Court of Appeals said (at p. 601): " Neither is the act a local or private one within the meaning of the section referred to. Such was the decision of this court. (*In the Matter of the N. Y. El. R. R. Co.,* 70 N. Y. 327, and *In the Matter of Church,* 92 N. Y. 1.) This act is general in its terms, applying to all cities in the State, of a certain class and to every corporation, carrying on a business requiring the use of electrical wires or conductors in such cities. That the number of such cities is limited or restricted, does not make the bill a private or local one, within the constitutional meaning and intent of these words, was expressly decided in the cases referred to.

" *How many companies there are to which this bill applies we have no means of determining, but the fact that a general law is passed regulating the operations of all such companies, in cities of the class referred to, does not constitute it a private or local bill, although it may happen that such companies are all located in one or more cities of the State.*" (Italics are the writer's.)

*Matter of Buffalo Traction Co.* (25 App. Div. 447) was a case which arose in the Fourth Department. In November, 1895, the Board of Railroad Commissioners denied an application of the Buffalo Traction Company for a certificate of convenience or necessity to construct a street railroad in Buffalo, section 59 of the Railroad Law requiring the consent of the Board of Railroad Commissioners to the operation or maintenance of a street surface railroad. The

company obtained the consent of the local authorities to the construction of the proposed route. The purpose of the act (Laws of 1896, chap. 649), which was entitled, "An Act to validate and confirm certain consents heretofore given by the local authorities of cities of the first and second class in the construction, operation and maintenance of street surface railroads therein," was to validate the consent given by the local authorities and relieve the traction company from compliance with section 59 of the Railroad Law. This purpose the Legislature accomplished by the passage of an act, in its general terms, validating consents given by the local. authorities of cities of the first and second class " since December first, eighteen hundred and ninety-five, and prior to February first, eighteen hundred and ninety-six," and relieving the recipients of such consents from the provisions of the General Railroad Law. On the face of the statute thus passed, the class of persons affected thereby was definitely closed when the statute was passed. It could apply only to existing corporations and only to those which had obtained consents from the local authorities during a period of two months. Not only was the class to which the statute could apply forever closed, but the limitation of time within which the requisite consents must have been obtained necessarily pointed to a class of exceedingly limited numbers. The constitutionality of the act was attacked under article 3, section 18, of the Constitution, which prohibited the passage of private or local bills for laying down railroad tracks, and under article 3, section 16, of the Constitution, the one here involved. The Appellate Division in the Fourth Department upheld the validity of the act under both sections, stating (at p. 454): " Unless a statute is absolutely at war with the Constitution it should not be declared invalid. (*People ex rel. Sinkler* v. *Terry*, 108 N. Y. 1.)

" Such is manifestly not the case here, for the act in question does not refer to the petitioner nor to any other corporation or association; neither does it grant to any existing railroad corporation in this State exclusive franchises; it simply confers and confirms certain rights and privileges to which the petitioner, in common with all other surface railroads in this State, was entitled under the general laws, but which it had omitted to avail itself of by failing to conform to the requirements of those laws, and it should, therefore, as we have already indicated, be regarded as *in pari materia* with the General Railroad Law. (*Matter of New York El. R. R. Co.*, 70 N. Y. 327; *Mayor, etc.*, v. *E. A. R. R. Co.*, 118 id. 389.)

" It may be that Buffalo is the only city and that the petitioner is the only railroad company in the State which will be affected or benefited by this enabling act. This circumstance, however,

does not constitute the law, which, as we have seen, is general in its terms, a local or private bill within the meaning of the provision of the Constitution to which we have adverted. (*People ex rel. New York Elec. Lines Co.* v. *Squire,* 107 N. Y. 593.)"

The Court of Appeals unanimously affirmed the Fourth Appellate Division, without opinion (155 N. Y. 700). A rather peculiar circumstance is that *Matter of Buffalo Traction Co.* (*supra*) was argued in the Court of Appeals on the same day that the *Henneberger Case* (*supra*) was decided, April 19, 1898, and was decided by the Court of Appeals about two weeks later. Thereafter an action was brought by a taxpayer named Kittinger to set aside the consents which had been granted, *first,* upon the ground that the consents relied on were procured by fraud; and, *second,* upon the ground that the act was unconstitutional. The Court of Appeals (*Kittinger* v. *Buffalo Traction Co.,* 160 N. Y. 377) affirmed the judgment on motion to dismiss the complaint for insufficiency, and again upheld the constitutionality of said act. Chief Judge PARKER, writing for the Court of Appeals in *Kittinger* v. *Buffalo Traction Co.* (*supra*), said (at pp. 395–397): "The next question is whether this is a general law or a local and special law. If the former, then if the views so far expressed be sound, this respondent is entitled to have the questions propounded answered in the negative, and this order affirmed; if the latter, then still other questions will have to be considered. The recent decision of this court in *Matter of Henneberger* (155 N. Y. 420) seems to have emboldened the appellant to argue that this is a local or special law instead of a general one. That question has been presented many times in this court when other statutes were under consideration, but of the decisions rendered thereon not one has found a place in the appellant's brief, and we shall soon show that the *Henneberger* case does not sustain his contention. This statute is general in form, applies to all the cities of the State of the first and second class, and to every street railroad therein that obtained consents within the dates named, and has not obtained the certificate required by section 59 of the Railroad Law, *and, hence, on its face, it is a general bill within the meaning of that term as used in the Constitution,* according to the decisions of this court. (*Matter of N. Y. El. R. R. Co.,* 70 N. Y. 327; *In re Church,* 92 N. Y. 1; *People ex rel. N. Y. El. L. Co.* v. *Squire,* 107 N. Y. 593; *Ferguson* v. *Ross,* 126 N. Y. 459; *People* v. *Dunn,* 157 N. Y. 528, 540.) In *Church's* case the statute granted to the board of supervisors in any county containing an incorporated city of one hundred thousand inhabitants, where contiguous territory in the county had been mapped out into streets and avenues, power to lay out, open, grade and construct the same, and to provide for the

assessment of damages on the property benefited, and the court held that it was not a local law within the meaning of the State Constitution. In the *Squire* case the act was entitled ' An act providing for placing electrical conductors under ground in cities of this State and for commissioners of electrical subways.' In answer to the contention of the appellant, that the act was a private or local bill, the court said: ' This act is general in its terms, applying to all cities in the State, of a certain class and to every corporation, carrying on a business requiring the use of electrical wires or conductors in such cities. That the number of such cities is limited or restricted, does not make the bill a private or local one, within the constitutional meaning and intent of these words, was expressly decided in the cases referred to. How many companies there are to which this bill applies we have no means of determining, but the fact that a general law is passed regulating the operations of all such companies, in cities of the class referred to, does not constitute it a private or local bill, although it may happen that such companies are all located in one or more cities of the State.' The argument of the court answers completely the suggestions of appellant's counsel on this appeal. This act is general in terms and applies to every situation, like that therein described, in all of the cities of the first and second class in this State. How many there may be we have no means of ascertaining, and it is not necessary for the one claiming the benefits of the statute to show that other corporations in the same or other cities enjoy the advantages of it.

" The constitutionality of a statute is not determined by matters outside of the statute, but from the statute itself. In the *Henneberger* case it was not the intention of this court to overrule or disregard any of the cases to which I have referred, as their discussion in the prevailing opinion and in *People* v. *Dunn* (*supra*) shows, the position taken in that case being that a very different situation was presented than in any of the cases previously considered by the court, and within which this one indisputably comes. Nor was the court unfaithful to the rule which prohibits the courts from going outside of the statute to inquire into the motives inducing legislation. In the statute itself the court found the proof of the legislative intent to confine the operation of the statute to a particular locality in the face of the provisions of the Constitution forbidding the Legislature from passing any private or local bill laying out or altering highways. (Art. 3, § 18.) " (Italics are the writer's.)

And, in conclusion, Chief Judge PARKER wrote (at pp. 397 and 398): " There is no constitutional restriction upon the power of the Legislature to validate and confirm consents to the construction

and operation of street railroads, notwithstanding the failure to obtain the certificate required by section 59 of the Railroad Law, and so we have simply to inquire whether, tested by the usual standards, this is a general or local statute within the intent of the Constitution. Thus tested, this act is found to be a general law within all of the decisions in this State by which the standards have been established, including the *Henneberger* case. There are not seven conditions present in this statute pointing out some particular railroad to be benefited. There is only one condition, and that is that the consents ratified shall have been given between certain specified dates, and it cannot ·be said of that condition that it pointed out that a single railroad was aimed at as conclusively ·as if the railroad had been named in the act. This case is not, therefore, within the rule of the *Henneberger* case, but is within the rule laid down by many decisions in this State, a few of which we have cited."

In our opinion, the cases above cited, and from which we have liberally quoted, fully answer the contention of the city that chapter 657 of the Laws of 1900 was a private or local bill, and also show that the *Henneberger Case (supra)* is without application to the case at bar. In the Buffalo cases it clearly appeared that the act sustained in those cases was expressly passed for the benefit of the Buffalo Traction Company and, in all probability, could not be availed of by any other corporation. By the act, its application was restricted to companies which had obtained consent of the local authorities within a limited period of but two months immediately preceding the passage of the act. On its face the act was inapplicable to any other than existing companies of a highly restricted class or to any other than the existing situations equally limited in number. The court, indeed, would have been justified in saying that the degree of particularization was such as would indicate that the act was applicable to but a single situation. The Court of Appeals twice unanimously sustained the validity of the act, first, by affirming the Appellate Division, Fourth Department, and by direct statement in the second case. The court, in so doing, distinguished it from the *Henneberger Case (supra)* upon grounds equally applicable, both on their face and as applied to the facts under consideration in this case.

Judge GRAY, who wrote for the Court of Appeals in *Matter of Henneberger*, also wrote in *People* v. *Dunn* (157 N. Y. 528) and in the course of his opinion in *People* v. *Dunn* Judge GRAY stated, referring to the decision of the Court of Appeals in the *Henneberger* case: " It was decided upon its special circumstances, as it was perfectly proper to do. (*People ex rel. Clauson* v. *N. & S. P. R.*

*Co.*, 86 N. Y. p. 6.) The act in that case was a most palpable device to evade the constitutional prohibition against passing local bills for laying out highways. It contained seven conditions, which had all to be met before it could become operative. The combination of restrictions was unprecedented in any other act, and was so remarkable as to, practically, localize the operation of the law, and so we held that it would be absurd to call it a general law. * * *."

There is another circumstance existing in the case at bar which is absent in the *Henneberger Case* (*supra*) and which, had it existed in the *Henneberger* case, would probably have moved the Court of Appeals to there reach a different result than it did, and that is the practical interpretation given by representative officers charged with and affected by the administration of the act here under review which is consistent only with its being a general act and as such validly enacted. The Court of Appeals in the *Henneberger* case intimated that under the circumstances prevailing in the case at bar the act should be upheld if possible. Furthermore, the act in question has also received legislative interpretation consistent only with its being a general law validly enacted as such. Judge GRAY, writing for the Court of Appeals in the *Henneberger* case, stated (at p. 429): " I admit that, where there has been a practical construction placed by the representatives of the people upon the constitutional provision, and where great public works in localities have been carried out through the assistance of large loans and investments of moneys, advanced upon the faith of the validity of the legislation which authorized them, it would not do for the courts to construe in too strict or illiberal a sense. * * *." Likewise, Judge VANN, in *City of New York* v. *New York City R. Co.* (193 N. Y. 543, 548) wrote as follows: " Under these circumstances the practical construction of the parties by a uniform course of conduct under all administrations of the city government for more than forty years is of controlling importance. When the parties to a contract of doubtful meaning, guided by self-interest, enforce it for a long time by a consistent and uniform course of conduct, so as to give it a practical meaning, the courts will treat it as having that meaning, even if as an original proposition they might have given it a different one. (*Woolsey* v. *Funke*, 121 N. Y. 87, 92; *Syms* v. *Mayor, etc., of N. Y.*, 105 N. Y. 153, 157; *French* v. *Carhart*, 1 N. Y. 96, 102; *Livingston* v. *Ten Broeck*, 16 Johns. 14, 22.) *So, when the meaning of a statute is doubtful, a practical construction by those for whom the law was enacted, or by public officers whose duty it was to enforce it, acquiesced in by all for a long period of time, in the language of Mr. Justice NELSON, ' is entitled to great,*

if not controlling, influence.' (*Chicago* v. *Sheldon,* 9 Wall. 50, 54.) In *People ex rel. Williams* v. *Dayton* (55 N. Y. 367) the practical construction of a doubtful statute by the legislative and executive departments, continued for many years, was held to have ' controlling weight in its interpretation.' To the same effect is the case of *Power* v. *Village of Athens* (99 N. Y. 592). It is held to have great weight even in the construction of the Constitution itself. (*People* v. *Home Insurance Co.,* 92 N. Y. 328, 337; *People ex rel. Einsfeld* v. *Murray,* 149 N. Y. 367, 376.)'' (Italics are the writer's.)

In the case at bar the Board of Railroad Commissioners and its successor, the Public Service Commission, three times acted under the authority of chapter 657 of the Laws of 1900. If this law was a local bill, then it conferred no authority whatever upon said Commissioners. For over thirty years the act remained unquestioned. That defendant at once commenced to operate under the approval granted by the State Board of Railroad Commissioners and the acceptance thereof by defendant on August 4, 1900, when the company first applied for and was granted permission for extension of its routes and later when on February 21, 1901, upon the approval by said State Board of Railroad Commissioners of its second application for approval of further extension of its routes, and under which certificates of approval of said Board it has since continuously operated under such franchises, with the acquiescence of the city, clearly appears in the stipulated facts hereon. As further indisputable evidence that the defendant, ever since the granting of its first application for permission to operate on its extended routes, down to the present time — a period of over thirty years — has operated with the acquiescence of the city, we have the stipulated facts that from September 30, 1900, down to September 30, 1931, the company has paid to the city of New York, for the privileges granted to it, and the city has accepted from the company, annually, five per cent of its gross receipts from the operation of the routes on Fifth avenue, pursuant to the authority of chapter 657 of the Laws of 1900, and the routes operated under the permits issued by the board of estimate and apportionment, such annual payments during said period of thirty-two years amounting, in the aggregate, to over $4,500,000, besides the payment to the city of five per cent of its gross receipts from advertising from October 1, 1909, to September 30, 1919. In addition to the payment to the city of the percentage of the gross receipts of the defendant, the defendant has annually paid to the city of New York license fees at the rate of twenty dollars per omnibus for thirty years from June 30, 1901, to June 30, 1931, aggregating $132,781. During the same period the company has annually paid to the

State of New York, pursuant to the provisions of section 184 of the Tax Law, being one-half per centum of its gross annual earnings, sums aggregating $466,290.99. And during the period from June 30, 1909, to June 30, 1931, the defendant company has paid to the city of New York, and the city has accepted, annually, real estate taxes upon its real estate and garages, aggregating, during said period, the sum of $642,082.27. The foregoing facts and figures, clearly appearing in the stipulated facts, would seem to be a complete answer to the contention urged in behalf of the city of New York, that it does not appear when the operation by the defendant of its franchises actually commenced, and would seem to dissolve any doubt that for over thirty years last past the company has operated under its franchises with the full approval of the city of New York. Under the franchises granted under said act the defendant, in addition to its license fee, paid to the city five per centum of its gross receipts from the operation of all its routes, including its previously existing routes. These payments have been continuously made by defendant and have been accepted by the city during this long period, the total amount, according to the agreed statement of facts, aggregating $4,565,704.24. The defendant company has invested many millions of dollars in providing facilities for the operation of its franchises, namely, in acquiring omnibuses, in building garages, in purchasing real estate for the housing and repair of its equipment. Approximately forty-five per centum of this investment may be fairly allocated to the defendant's extended routes now in question. The investment made by defendant is substantially double that which would be required but for the operation of these extended routes. The performance of the public service of operating its bus lines has covered a period of over thirty years, and since 1909 the defendant's operations have been subject to the direct supervision and control of the Public Service Commission or its successor, the Transit Commission, a State agency which has actually exercised such control. In our opinion the practical construction which has been placed upon the statute by the public authorities should have great weight in upholding the constitutionality of the act under which the franchises were granted. In addition, the defendant company has paid to the State itself a tax on gross receipts derived from the operations over its extended routes, as well as real estate taxes. It would be difficult to conceive of a case where the rule recognized by the Court of Appeals in the *Henneberger* case would be more applicable. In that case the court intimated that such a statute would be valid where there had been a practical construction placed by the representatives of the People upon the application of

a constitutional provision to the statute under which they acted, and where, as here, large sums of money had been invested upon the assumed validity of such statute.

If we assume that chapter 657 of the Laws of 1900 was a private or a local bill, we find that it complied with the requirements of article 3, section 16, of the Constitution. That section provides that no private or local bill shall embrace more than one subject and that such subject shall be expressed in the title. There is but one subject contained in the title. That subject was the conditions under which and the terms upon which a franchise for the extension of an existing stage route might be granted. The introduction into the bill of the right to charge a ten-cent fare was not the introduction of an additional subject, but germane to its general subject-matter, as found in the authorities, and if this act be a private or local bill, the subject was properly expressed in the title. The law enacted was entitled: " An Act to amend the Transportation Corporations Law by the addition thereto of a new section in relation to existing routes and extensions." This title put all members of the Legislature upon notice that the bill contemplated some change in the law governing such cases. It is not necessary that the title should embody the substance of the act but only state the subject-matter. The subject-matter of chapter 657 of the Laws of 1900 and the measures thereby authorized were germane and such as would facilitate the accomplishment of the purpose expressed.

The city contends that chapter 657 of the Laws of 1900 was a special city law within the meaning of section 2 of article 12 of the Constitution of New York. We do not so construe the enactment. Article 12, section 2, of the Constitution of 1894, as in effect in 1900, provided for the classification of cities into three classes. It required the submission of special city laws to the mayor of the city or cities affected and either acceptance by the city or repassage by the Legislature without the city's acceptance. As this procedure was not followed as to chapter 657 of the Laws of 1900 (Submission, ¶ 4, fol. 9), if it is a " special city law " it was enacted in violation of article 12, section 2. The laws to which this provision of the Constitution applies are limited to " Laws relating to the property, affairs or government of cities, and the several departments thereof * * *." An act making provision for the granting of franchises is not an act relating " to the property, affairs or government of cities," and hence the act is not one of those contemplated by the provision in question. The latter contemplates laws which relate to municipal property and affairs. No

case in this State construes the words "relating to the property, affairs or government of cities," to hold that they include legislation which does not deal directly with the internal affairs of the city or the functions of its officers, and which affects the welfare of the general public as well as the residents of a city or cities.

By chapter 466 of the Laws of 1901, section 1461 of the Greater New York Charter and its accompanying title were amended to read as follows: "Not to be run except in conformity with preceding sections or as hereinafter provided.

"§ 1461. It shall not be lawful to run stages or omnibuses in The City of New York, as constituted by this act, except in conformity with the preceding sections, * * * but nothing in this act shall be construed to affect the right possessed by any company to operate stage routes or extensions then established and in lawful operation, nor to affect any authority conferred upon any such company to acquire rights and privileges under chapter six hundred and fifty-seven of the Laws of nineteen hundred, nor to affect any acts heretofore done thereunder."

This provision was made in section 1461 for the continuation of the jurisdiction of the Board of Railroad Commissioners under chapter 657 of the Laws of 1900. Its obvious purpose and intent were (1) to continue the authority of the Board of Railroad Commissioners under chapter 657 of the Laws of 1900, and (2) to ratify and confirm all acts theretofore done under said chapter. The provisions of sections 1459 and 1461 of the charter were, therefore, not effective to render unlawful the defendant's operation of its franchise. Nor was the act of 1900 superseded by chapter 629 of the Laws of 1905 which amended section 242 of the Greater New York Charter. By chapter 629 of the Laws of 1905 the Greater New York Charter was amended by the addition to section 242 of a new subdivision (3) which conferred upon the board of estimate and apportionment "the exclusive power in behalf of the city to grant to persons or corporations franchises or rights or make contracts providing for or involving the occupation or use of any of the streets, * * * within or belonging to the city * * *." The transfer from the board of aldermen to the board of estimate and apportionment of power to grant franchises in behalf of the city, made by the amendment of 1905, left undisturbed the proviso above quoted in section 1461, specifically referring to chapter 657 of the Laws of 1900. After the 1905 amendment, as before it, therefore, the provisions of the city charter relative to franchises contained the express recognition, above quoted, that rights and privileges as to stage routes and extensions had been and could be acquired under chapter 657 of the Laws of 1900. After 1905, as before, the city

charter provided the machinery for granting franchises to omnibus corporations, and the General Laws (Transp. Corp. Law, § 23, as inserted by Laws of 1900, chap. 657) provided that the Board of Railroad Commissioners should have power to grant franchises for extensions to routes already in existence. The transfer of the power of granting franchises in behalf of the city from the board of aldermen to the board of estimate and apportionment did not detract from the power already bestowed upon the Board of Railroad Commissioners, and did not affect the express recognition of that power contained in the charter itself. Section 242 of the charter, as so amended in 1905, bestowed upon the board of estimate and apportionment the exclusive power in behalf of the city to grant franchises, but the fact that section 1461 was left intact with the proviso safeguarding the rights of companies able to comply with chapter 657 of the Laws of 1900 shows that it was not intended to interfere with the power previously granted by the Legislature of the State to a State body to authorize extensions to routes of existing corporations.

There cannot be held here that there was a repeal of the act of 1900 by implication. As to the pleas of *res adjudicata*, laches, limitations and estoppel, we set forth our views as to their maintenance here, although the validity of the act is, in our opinion, established. We, however, cannot agree with the contention of defendant that the judgment in the action of *City of New York* v. *Fifth Avenue Coach Co.* (95 Misc. 366; affd., 182 App. Div. 887; affd., 228 N. Y. 577) is a bar to the maintenance of this action on the ground that the validity of the act of 1900 was necessarily involved in the decision in that action. The city, as plaintiff, did not allege that the company was operating under a valid franchise or even under any franchise, and it did not even allege that the company was *duly* operating under the act of 1900, but only that it was operating thereunder. This involved no concession or admission on the part of the city that either the act of 1900 or the privileges obtained thereunder were valid. The company was at least operating under color of that act and the act required the payment of five per centum of the gross receipts. The action was brought to recover such percentage of the gross receipts from advertising, which the company has not been paying. The company itself was in no position to question the validity of the act even if it had desired to do so. The city did not allege or prove the existence of a valid franchise and such validity was not in issue. The only question involved in the case and the only question submitted to the jury was the right of the city to recover a percentage of the receipts from advertising in the com-

pany's coaches as the parties had construed and dealt with each other with respect to receipts under the operation of the company's lines. It is evident from the complaint, answer and question submitted to the jury that the validity of the company's franchise under the act of 1900 was not at issue, was not considered, and, of course, was not decided. The judgment entered on the verdict of the jury could not, under these circumstances, constitute *res adjudicata* so as to bar the city in the instant case from raising the issue.

The defendant urges that, at all events, the plaintiff, the city of New York, is estopped from questioning the validity of chapter 657 of the Laws of 1900 and is barred by laches from seeking to enjoin the defendants (or any of them) under the certificates issued by the Board of Railroad Commissioners, because the city has acquiesced for a period of thirty-two years in the exercise of these franchises and has accepted five per centum of the gross receipts paid throughout this period, pursuant solely to the provisions of the very act whose validity is now questioned. It has twice litigated the rights of the city and the company respectively growing out of the exercise of these franchises, *first*, in the exterior advertising case,[*] wherein the company asserted that the ordinance there under review violated its franchise rights, and, *second*, in the interior advertising case,[†] wherein the city invoked the very statute now asserted to be invalid as the basis of the recovery sought and obtained. In the first case it could have contested the validity of the franchises now in question, but did not. In the second case it sought affirmative relief under the very act which it now attacks.

As a general principle, a person or corporation which has accepted or claimed the benefit of a statute will not be heard to question its constitutionality. This rule has been applied to municipal corporations in exceptional circumstances only. It is asserted that by suing and recovering judgment under the very act now attacked, the city itself brought itself within the rule of estoppel, in law as well as in morals, from now contesting the validity of the very act under which it proceeded. It is argued that the city's receipt, over a period of thirty years, of five per centum of the gross receipts of the company, paid pursuant to the act whose validity is now challenged, would be equally effective to bar the suit.

The defendant is and has at all times been chargeable with notice of its legal incapacity and deficiencies, and it can take nothing because of the failure of the State or the city to make earlier discovery of them. No action, or failure to act, upon the part of the city authorities constituted an estoppel so as to dispense with the

---

[*] See 58 Misc. 401; 126 App. Div. 657; 194 N. Y. 19.  [†] See 95 Misc. 366.

necessity of complying with the provisions of the Constitution and the statutory requirement necessary to validity. No act or omission on the part of the city officials could estop the city from now questioning the validity of the company's rights, nor could any construction of the act of 1900 by such officials amount to a waiver of constitutional objections, if such really exist. Nor is the city barred by laches or by any Statute of Limitations from seeking to enjoin the company's operations under the " certificates."

The company contends that the city is barred because of the laches of its officials or by the provisions of sections 53 and 54 of the Civil Practice Act, from seeking to enjoin its operations under the " certificates." The agent or officer whose acts, omissions or acquiescence are claimed to have given the company the rights which they claim in the streets must be shown to have had the power to confer such rights. If such agent or officer did not have such right, his acquiescence of neglect avails no more than would his agreement to grant or ratify such rights, if he has not the power to do so. The city is not estopped by his acts or omissions.

Sections 53 and 54 of the Civil Practice Act, prescribing certain limitations of time for the commencement of actions, have no application to one involving the use or occupation of a public highway. In any event, such statutes of limitation would not involve a continuing trespass.

We conclude, too, that the grant to or acceptance by the company of the " certificates " under the act of 1900 created no contract or property rights within the meaning of article 1, section 10, and section 1 of the Fourteenth Amendment of the United States Constitution or within the meaning of article 1, section 6, of the State Constitution. Article 1, section 10, of the Federal Constitution provides, in part: " No State shall * * * pass any * * * law impairing the obligation of contracts." It does not appear that this section of the Federal Constitution is at all involved in this controversy. There has been no attempt by the State to pass a law impairing any contract between the company and the State or city.

In view of our rulings as to the validity of the act of 1900 under the Constitution and the various acts deemed to have repealed its grant of power, we hold that the prayer of the plaintiff for an injunction should be denied upon its merits, and it should be adjudged and decreed that the defendant has franchises or rights to operate in perpetuity over the routes specified in the certificates of the Board of Railroad Commissioners and the Public Service Commission for the First District, and that the prayer of the

plaintiff for an injunction restraining the operation of the said routes be dismissed upon its merits.

Judgment in favor of defendant should be directed accordingly.

TOWNLEY, J., concurs; O'MALLEY, J., concurs in result; FINCH, P. J., and MARTIN, J., dissent.

FINCH, P. J. (dissenting). Since the amendment of the Constitution in effect January 1, 1924, such legislation as is here under consideration, affecting cities of the first class, would be clearly unconstitutional. As pointed out by the Court of Appeals in *Matter of Mayor, etc., of New York (Elm Street)* (246 N. Y. 72): " Up to that time, the distinction between special or local laws on the one hand and general laws on the other was directed to the form of the enactment rather than to its substance. If the act by its terms was applicable to a class, it did not cease to be general though the fact would appear, if extrinsic evidence were received, that it was local in effect. [Citing cases.] Even then there was a point beyond which evasion was not suffered. Identifying tokens might be so many and particular that classification would find an end and designation a beginning (*Matter of Henneberger*, 155 N. Y. 420). * * *

" The Home Rule Amendment [Const. art. 12] established a new test. We are no longer confined to the inquiry whether an act is general or local ' in its terms.' We must go farther and inquire whether it is general or local ' in its effect.' "

We are of opinion, however, that in this case the Constitution as it stood at the time of the enactment of the statute in question sufficiently protected the city and its citizens from the inroads of evasion by that act attempted to be accomplished. Without any extrinsic evidence as to its effect, as the Constitution would now permit, and judging the act by its terms alone, we are still unable to follow the reasoning which holds chapter 657 of the Laws of 1900 other than a local bill.

At the time this legislation was enacted, there was a complete plan of law embodied in the New York City Charter expressly designed to protect the citizens of the city of New York, acting through its mayor and other officers, and the streets of the city, from being overridden by those seeking to use the streets for commercial purposes. At that time also there existed a Transportation Corporations Law, one article of which, consisting of three sections, related only to stage coach corporations, and by its terms had no relation to the city of New York. To this article was added, by chapter 657 of the Laws of 1900, a fourth section, drawn in general language. By reason, however, of its insertion into an article which

did not apply to the city of New York, attention was distracted from the fact that by its terms only the most extraordinary chain of circumstances could ever make it applicable to any other locality; and such application was further dissembled by leaving unchanged the provisions of the article exempting the other three sections from applying to the city of New York. In addition, not a word was said in this amendment which in any way repealed any of the provisions of the charter laws governing said city. The result was that though this new section enabled any stage coach corporation which came within its terms to obtain valuable franchises in the streets of the city of New York, unhampered by any provisions of the city charter, yet no new corporation could be organized under said Transportation Corporations Law for the purpose of operating stages in said city, for the article still confines the field of operation of corporations organized thereunder to localities other than the city of New York. To this day, any corporation seeking to share with the defendant the privileges of a bus franchise in the city of New York must be one organized under some other law than the Transportation Corporations Law although by such amendment to this law the defendant has obtained and exercised the extensions of its route. This anomaly alone stamps the amendment, in spite of its general terms, as never having been intended to be anything but special legislation. With such a setting for its enactment, it is not surprising that, as we find, other vices mark its every feature.

The amendment applies only to cities of the first class, which at that time comprised only two cities, namely, New York and Buffalo. Admittedly, such a restriction in terms was proper classification. In order, however, to come under the terms of the amendment, it was not sufficient that the applicant for its benefits be any corporation operating a lawfully established stage route, but such corporation must be one incorporated under the laws of the State of New York. All corporations lawfully operating stage routes and that have been incorporated elsewhere than in the State of New York are excluded. There is no provision of law against other than a domestic corporation receiving a franchise for the operation of a stage route entirely within the State of New York. Yet this act specifies that such a corporation can never take anything thereunder. So far as classification is concerned, there is no reason to exclude this large class of corporations incorporated under laws other than those of the State of New York. In adopting such classification, the law does not apply to and include within its operation all objects reasonably within the classification attempted.

Such specification, however, though unnecessary for classification,

is very serviceable for identification, and if a corporation organized under the laws of a sister State was eligible to operate a stage route within this State in other than cities of the first class, then so to phrase this act as to exclude such a corporation from its benefits could not be merely for purposes of classification, but only for the purpose of closing in upon the identity of the particular corporation intended to be benefited by it.

Again, not only is any corporation desiring to take advantage of this act required to be incorporated under the laws of this State, but the incorporation must be under such laws "heretofore enacted." No opportunity is afforded for any other corporation to qualify for the benefits of the act if subsequently incorporated under any amendment of then existing law. The language is, "any law of this State heretofore enacted." As the act provided that it should take effect immediately, "heretofore enacted" must have meant and been intended to mean "enacted before this act takes effect." No reasonable purpose for such a limitation could exist on the ground of classification, and no other purpose could be served except to furnish additional assistance in identification of the intended beneficiary of the act. Nothing but the plight in which defendant now finds itself suggests any reason for holding that the word "heretofore" as used in the act really means "hereafter" or both "heretofore and hereafter." If the act had been intended to embrace corporations organized under laws "heretofore or hereafter enacted," it might not have suited defendant's purposes, but, even though it might have admitted a competitor into the local field, it would have removed this objection to its being deemed to be a general act. That the objection is good is shown by what was said in Matter of N. Y. Elevated R. R. Co. (70 N. Y. 327), in deciding that the act there being considered was not a local law: "The act is thus made applicable to companies to be formed and to existing companies, and is thus made as general as it can be. * * * The existing companies have no exclusive privileges or functions conferred. They are simply placed on a footing of equality with new companies which may be formed under the act."

In addition to being incorporated in this State, and being so incorporated under the laws as then enacted, this amendment provided that such corporation must at the time of the enactment have owned and operated a stage route which had been continuously operated by the same company or its predecessors in title to such route for five years last past. The defendant could fulfill all those conditions. Some other corporation desiring to be its rival might not have owned and operated such a route for five years prior to the passage of the act, but leased it on or about the date on which

the act took effect, or it might be both the owner and operator of its route at the time of the enactment, and might have owned it for five years prior thereto, but during all or part of such five years leased the same for another to operate. Or it might have been the owner and operator of an established route for five years prior to the enactment, and at the time of its passage operated the route as lessee but not as owner. Such a corporation, whether as owner and operator, or operator alone, would be ineligible, though it fulfilled all reasonable requirements of permanency and efficiency of service, because the identifying tokens of the amendment would fatally discriminate against such a rival and redound only to the benefit of the defendant.

The amendment in question is thus a local law because its terms exceed any reasonable classification and serve only as means of identification.

Defendant seeks to obviate a part of this criticism by the present contention that the expression " five years last past " does not refer to the time of the passage of the act, but to the date of the approval by the State Board which the amendment substituted in place of the approval of the local authorities designated by the Greater New York Charter.

It is strange that the defendant should need a second special construction of plain words in the first sentence of this brief statute when it bears evidence that its every word was carefully chosen and considered in order to effectuate the purpose sought. But seriously considering defendant's contention, it cannot, of course, be disputed that where a statute is open to two permissible interpretations, under one of which it is constitutional and the other not, the former will be adopted. In order, however, to invoke such a rule, there must be two permissible interpretations, and not merely a necessity for a strained construction in order to enable defendant to take advantage of it.

Giving to the act the ordinary meaning of the words used, we are clearly of the opinion that they speak as of the date on which they went into effect as a statute; that a stage route operated " for five years last past " then meant such a route operated for a period of five years then last past. Any other construction would, in our opinion, be forced and strained and unwarrantable. Words must be taken in the light of the circumstances in which they were used, and not as subsequent events may lead the parties interested to wish them to be understood. There was nothing in the circumstances as they existed in 1900, so far as appears, which required that the meaning of the words " five years last past " should perennially spring forward to cover a five-year period prior to

every passing year. It was only necessary then that they should relate to a time prior to the taking effect of the act, and there is nothing to indicate that they were then intended to have any other meaning.

Holding, therefore, as we must, that the words " five years last past " mean five years prior to the enactment, the act is bad on this account also, not only because those words are tributaries to its scheme of identification, rather than classification, but, further, because they confine the application of the act only to then existing cities of the first class. As above stated, at the time of the passage of the act there were but two cities of the first class in the State of New York, namely, the cities of New York and Buffalo. Since, as above clearly shown, the words " for five years last past," as used in the statute, mean five years prior to its passage, then, although other cities might indeed (as one has in fact) thereafter become by increase in population cities of the first class, yet they could never fulfill the conditions which would extend the operation of the statute to them, because they could never become cities of the first class in which any corporation had owned and operated a stage route " for five years last past," i. e., for five years prior to the enactment. They would be excluded from the operation of that law for all time to come, because the statute by its terms confined its application to the two localities which at that time were already cities of the first class, thus rendering it distinctly a local bill.

The fact that a law at the time of its enactment operates upon one locality only is not of itself fatal to the claim that it is a general law, but the fact that it was so framed that it can never embrace any other locality renders it local. Such test has been applied by the courts of this State in determining whether particular statutes were local or general. (*Matter of Church*, 92 N. Y. 1; *Matter of McAneny* v. *Board of Estimate, etc.*, 232 id. 377.)

In *Matter of Church* (*supra*), in arriving at the conclusion that the act there considered was general, it was said: " The class consists of every county in the State having within its boundaries a city of one hundred thousand inhabitants and territory beyond the city limits mapped into streets and avenues. How many such counties there are now, *or may be in the future*, we do not know, and it is not material that we should." Such reasoning would have been meaningless in that case unless it were sufficient to know that in the future it was possible that the act might apply to other counties.

In *Matter of McAneny* v. *Board of Estimate, etc.* (*supra*) the court held the act then under consideration general, saying: " It applies

to all cities in the State having a population of a million or more. It may be conceded that at the present time it is applicable only to the city of New York, but if so it by no means follows that it was intended only for that city, since there may and probably will in the near future be one or more cities to which it will be applicable." Again, such reasoning would not have been used unless it had been deemed that, even where a number of cities are included in the class, a description of them by population (which is what " cities of the first class " amounts to) is not classification if the statute does not contain any provision by which it is made applicable to municipalities subsequently coming within the prescribed population.

Defendant, however, says that a practical interpretation has been given to the act with respect to the words " five years last past " by the public officers charged with its administration. In 1900 and 1901 the Board of Railroad Commissioners, upon application of the defendant, issued its certificates of approval of certain routes; and in 1912 the Public Service Commission, as successor to said Board, issued a further like certificate. In all said certificates there are recitals to the effect that due proof has been given that the company and its predecessor in title owned and operated a lawfully established stage route which had been continuously operated by it and its predecessor for five years last past. In 1901 the expression " five years last past," as used by said public officers, would relate back to only four years prior to the passage of the act; and in 1912, " five years last past " would go back only to seven years subsequent to its passage. Hence, defendant claims, by such interpretation apparently given by the Boards which granted the certificates, the expression applied not only to situations in being at the time of the enactment, but to those existing at the date of the applications for certificates. Defendant is obliged to admit that such an interpretation, if made by said Boards, would not be binding on the court, but still urges that it is persuasive and should not be overlooked.

A very little scrutiny shows that the recitals in the certificates are no evidence of such an interpretation by said Boards. The company in each of its applications, which were unopposed, described itself as having been engaged, as was the fact, in the continuous operation of its original route for a period of *five years prior to the passage of the act*. This is strong evidence of the interpretation defendant then placed upon the words " five years last past." No other interpretation of their meaning was then necessary for the purposes of the certificates. Thus, there being no occasion to make the interpretation which defendant now claims, or one different

from that which defendant then gave in its applications, it cannot be assumed that it was made by said Boards.

It can, therefore, be truly said, as the Court of Appeals pointed out in *Matter of Mayor, etc., of New York (Elm Street) (supra)*, that here the identifying tokens were so many and particular that it was not an attempt at reasonable classification, but a designation and identification of the particular beneficiary of the act. It was an attempt so to frame and enact the legislation that it would apply not to all corporations owning or operating stage routes, or to all stage routes reasonably within the classification, but to a particular corporation or corporations to be found within two of the cities of the State which could qualify as coming within the description. *More narrowly, it was an attempt, while still keeping in force the general provisions of the local law, namely, the general charter provisions applying to the city of New York, to carve out from the application of such local law a certain designated corporation or corporations within the locality, in accordance with the particular designations and identifications specified in the statute under consideration.*

If the bill had been so drawn as to apply to all stage corporations in cities of the first class that had been in operation for five years, then it could be said that it was a case of classification within the Constitution. To benefit, however, this particular corporation, it was necessary further to whittle down the scope of its application by adding conditions (to quote the language of the Court of Appeals in *Matter of Mayor, etc., of New York [Elm Street], supra)* " so circumscribed and narrow that the class subjected to the statute is one in name and nothing else." It is those additional features which reveal so palpable an evasion of the Constitution as should render it unsuccessful.

The leading case in support of our conclusion, cited as still good authority in *Matter of Mayor, etc., of New York (Elm Street) (supra)*, is *Matter of Henneberger* (155 N. Y. 420), where it was said: " In passing upon a statute, its validity or invalidity, under the constitutional provision, depends upon the special circumstances of the case; which, therefore, can constitute no precedent, except and unless those circumstances are seen to exist in and, therefore, to vitiate another case. \* \* \* While an act might be general, if it affected all towns of a class and that class was based on population, or some other condition, which might be recognized as possibly common to a class, or which might permit of classification; if it contain such added limitations as to restrict its operation to what must always be, in the nature of the case, a very limited number of specified localities, if not, in fact, one, then it is local within the constitutional sense."

We are referred to no authority, and we know of none, that over-rules this statement of the law upon the question before us. Neither can it be successfully gainsaid, in view cf the many tokens of identification above pointed out, unnecessary for reasonable classification, that the act now under consideration contains such added limitations to the conditions of classification as to restrict its operation to a limited number of localities, if not, in fact, one, and hence is local within the constitutional sense. Again to quote from *Matter of Mayor, etc., of New York (Elm Street) (supra)*: "We close our eyes to realities if we do not see in this act the marks of legislation that is special and local in terms and in effect. This group of conditions so unusual and particular is precisely fitted to the [defendant's] case, and only by a most singular coincidence could be fitted to any other. If we may not say of such a coincidence that it is literally impossible, at least we may say that one would be surprising, and several would be marvelous. An act is not general when the class established by its provisions is at once so narrow and so arbitrary that duplication of its content is to be ranked as an unexpected freak of chance, a turn of the wheel of fortune defying probabilities."

Defendant cites as sustaining a contrary view: *Matter of N. Y. Elevated R. R. Co.* (70 N. Y. 327); *People ex rel. Clauson* v. *Newburgh, etc., Plank Road Co.* (86 id. 1); *People ex rel. N. Y. Elec. Lines Co.* v. *Squire* (107 id. 593); *Matter of Buffalo Traction Co.* (25 App. Div. 447; affd., without opinion, 155 N. Y. 700); *Kittinger* v. *Buffalo Traction Co.* (160 id. 377); *People* v. *Dunn* (157 id. 528); *Matter of Metz* v. *Maddox* (121 App. Div. 147; revd., 189 N. Y. 460), and other cases.

*Matter of N. Y. Elevated R. R. Co. (supra)* held that a local act which did not confer any new franchise, but simply confirmed and regulated franchises previously possessed by the company's predecessor, was not unconstitutional as in violation of article 3, section 18, of the Constitution, prohibiting a private or local bill granting to any corporation the right to lay down railroad tracks, or any exclusive privilege or franchise. In that respect the decision has no application to the present case. It further held that a law (the Rapid Transit Act) authorizing the construction of steam railways in all the counties and cities of the State, was not local because *one of its sections* provided that the Commissioners appointed pursuant to its provisions were given the power to fix and determine the route or routes by which any elevated steam railway "now in actual operation" may connect with other railways or ferries upon certain conditions, nor because there was but one elevated railway in actual operation at the time of the passage of the act.

This, however, as appears from the opinion, was held in connection with the fact that the section in question was not a separate and independent act, but was embodied in a general scheme for the construction of elevated and underground steam railways, and was to be so treated. As was there said: " It provides for the formation of new companies for their construction; and where a route designated by the commissioners is coincident with a route upon which an existing company is authorized to construct, such company may construct its road under the act, and any company having an elevated railway in actual operation may construct the connections specified. The act is thus made applicable to companies to be formed, and to existing companies, and is thus made as general as it can be. In any case the constructing company is to comply with the plans prescribed by the commissioners. *By what rule of construction are the provisions applicable to existing companies isolated from the rest of the act?* They are an appropriate part of the general scheme, and it could make no difference whether there was one or many existing companies. The existing companies have no exclusive privileges or functions conferred. They are simply placed on a footing of equality with new companies which may be formed under the act." Such qualification robs this case of all force as a precedent in defendant's favor.

In *People ex rel. Clauson* v. *Newburgh, etc., Plank Road Co.* (*supra*) an act passed in 1876 authorized turnpike and plankroad companies to extend their charters, so far as related to the companies therein specified, *i. e.*, those that had operated for twenty years " last past " over three miles in length or not less than a third of the original route — and abrogated all other modes prescribed by former acts for extending such charters, and furnished the only mode in which the extension could be had. The two counties of Kings and Orange were exempted from the operation of said act. By chapter 253 of the Laws of 1879 said act of 1876 was amended by extending its operation to the county of Orange. *Held,* that the act of 1876 was not a local act, and the amendment extending its application was not a local act; but that, if they were local acts, *it would seem* they would not offend against the Constitution (Art. 3, § 16).

It may be observed that in so holding the court had no occasion to, and did not, consider the effect of the words " twenty years last past " upon the constitutionality of the act. The defendant whose rights were being passed upon had been in existence for twenty-six years prior to the passage of the act, and that question was not raised. If it had been raised, it would have been immaterial, because the act applied to all but two counties of the State, and

all the court had to determine was whether that made it a local
act. Upon determining that that circumstance did not render it
a local act, the circumstance that it applied to all companies which
had managed and operated turnpike and plank roads for twenty
years " last past " could not affect its constitutionality one way or
the other. The statement that if the acts in question were local
acts, they would not offend against article 3, section 16, of the
Constitution was not based upon any ground stated in the opinion;
it would seem to be based on the view that the act contained but
one subject and that the one expressed in its title, but as it was
unnecessary so to hold, this case cannot have any bearing upon the
question here involved.

*People ex rel. N. Y. Elec. Lines Co.* v. *Squire (supra)* related
to an entirely different situation from that here presented, and
neither states nor holds anything contrary to any view herein
expressed.

*Matter of Buffalo Traction Co. (supra)* held that an act which
by its terms was limited to cities of the first class was not a local
bill merely because there existed only one corporation to which it
could apply. This is not disputed, and, moreover, it is not a
question that is involved in this case.

*Kittinger* v. *Buffalo Traction Co. (supra)* was a companion case
to *Matter of Buffalo Traction Co. (supra)*, relating to the same
statute. It was held that the additional limitations present in the
*Henneberger Case (supra)* were there absent, and, therefore, the fact
that the act affected only the city of Buffalo and one corporation
in that city, did not make it a local law, since there was no proof
in the statute itself of a legislative intent to confine its operation
to a particular locality in the face of the constitutional provision.
This is easily distinguishable from the present case, where the
intent to confine the operation of the act to one city and to one
corporation therein appears from the number of limiting conditions
above pointed out, which were entirely unnecessary for reasonable
classification and good only for identification.

In *People* v. *Dunn (supra)* the constitutionality of an act pro-
viding for a special jury in criminal cases in each county having
a certain population was considered; and it was held that the fact
that the application of the act is restricted to " each county of the
State having a population of five hundred thousand or more " does
not render it a local bill within the meaning of the constitutional
prohibition (Art. 3, § 18) against the passage of any local bill as to
selecting, drawing, summoning or impaneling jurors. All that was
said in that case on the subject of constitutionality or in relation

to the *Henneberger* case does not affect the soundness of the decision or opinion in the latter case or permit this court to disregard its authority.

In *Matter of Metz* v. *Maddox* (*supra*) the Appellate Division decided that an act (Laws of 1907, chap. 538) authorizing a judicial recount and recanvass of votes cast for mayor in 1905 in cities of the first class does not offend article 2, section 6, of the Constitution, requiring that all laws creating boards or officers for counting votes cast at elections shall secure equal representation of the two largest political parties, for the constitutional provision has no application to a judicial review of an election contest. On appeal to the Court of Appeals, this determination was reversed, and it was held that the act was unconstitutional, in that the proceeding authorized is either a recanvass of the votes cast for the mayor or is a judicial hearing and determination of the title of the respective candidates for that office; if a recanvass, it contravenes section 6 of article 2 of the Constitution, providing for a recanvass by a bipartisan board, which a court is not; if a judicial determination of the title to the office, it contravenes section 2 of article 1 of the Constitution, providing for a trial by jury " in all cases in which it has been heretofore used," of which an action of quo warranto is one. Since that was all that was decided in that case, it does not touch the questions here involved.

The other cases cited by defendant on the subject of constitutionality have been examined, but they either have no application to the question here involved or are clearly distinguishable because of the special circumstances which prevent them from becoming a precedent here. Indeed, in invoking judicial authority for its contention, defendant seems to have lost sight of the conditions under which one decided case can be deemed to control the decision of another. Decisions are precedents only where the essential facts are similar; and in construing the opinion of a court, it is limited by the facts of the case under consideration when it was rendered, and not extended to cases where different facts exist. Furthermore, the opinion of a court must be tested as a whole, and whatever was said must be tested by reference to the actual question then before the court. Applying these elementary rules, the cases cited by defendant, as above pointed out, differing as they do in the essential facts under consideration, present essentially different questions for determination. Therefore, whatever may be thought of *Matter of Henneberger* (*supra*), as any authority in support of the view that the act is unconstitutional, it is apparent that the cases cited by defendant are of no avail as precedents in this case.

Concluding, therefore, that chapter 657 of the Laws of 1900 was a local act, the next question is, does it embrace in its title more than one subject?

The title of the act is: " An Act to amend the Transportation Corporations Law by the addition thereto of a new section in relation to existing routes and extensions." Thus, the title relates to certain routes and ways of travel already in existence for stage coaches, and extensions thereof. This language has clearly nothing to do with rates of fare to be charged on any existing route or extension. And yet, tucked away in the statute itself is a right to charge a fare not exceeding ten cents per passenger over the whole or any part of the routes owned or operated by a corporation answering the specification of the statute. Under this provision, defendant, the only one that could fulfill all the conditions specified in the act as to a corporation entitled to its benefits, has claimed and exercised the right to charge a fare of ten cents per passenger over its original route as well as the extensions thereof which it has obtained, although the act (Laws of 1886, chap. 536) under which it and its predecessor in title had operated limited the rate of fare to five cents.

Under an act so entitled, we might expect to find that such a corporation would be authorized to abandon one thoroughfare and transfer its routes to another thoroughfare. In other words, we might expect that the corporation here under consideration might abandon Fifth avenue altogether and run up and down Broadway. But certainly it could not be expected from a reference in the title to stage routes and extensions that a corporation which took any extension of its routes pursuant to the act could by any stretch of the imagination become entitled to a rate of fare different from that already fixed by law over the same route theretofore traversed.

Furthermore, courts should not be entirely blind to the facts of common everyday experience. From the earliest times, the subject of a rate of fare to be charged by a transportation company has been of the greatest political concern. Campaigns and policies have been victorious or defeated by the injection of such an issue. Yet, here it is solemnly urged that a right to change the fare may be held to be within a title which is expressly confined to the routes to be traversed.

We are also of opinion that by permitting the operation of stages and omnibuses " propelled by electricity or any other motive power," still another subject was embraced in the act. This provision allowed a change of motive power from horse-drawn stages, as used theretofore, to the modern larger, high-powered and more rapid

automobile stages, thus adding an increased burden upon the highways and greater dangers to the public using them. It also allowed a change to " any other motive power " which inventive genius may bring forth, however novel or fantastic it may be, so long as approval for it can be obtained from an official in no way responsible to the citizens of the municipality. Such an enlargement of rights theretofore conferred could not have been made except by statute. · And yet defendant claims that, assuming this act to be local, such an innovation does not infringe the Constitution by adding any new subject other than that expressed in the title. To state such a proposition is to condemn it.

*Matter of N. Y. Elevated R. R. Co.* (*supra*) holds nothing to the contrary of this in stating (p. 338): " So a bill may be passed giving a private railroad corporation the right to use a new or different motive power, provided the right be not exclusive." The court was there passing upon a section of the Constitution prohibiting the passage of a local bill granting to any corporation the right to lay down railroad tracks or any exclusive privilege or franchise; and its statement means nothing further than that, since the bill there considered did not give the railroad company any exclusive privilege to the new motive power, it did not violate that section of the Constitution.

There are other provisions in the act which are not expressed in the title, but enough has been here set forth to show that there were material subjects which were not included in the subject expressed in the title. In other words, in violation of the Constitution, the bill, being local, embraced more than one subject; and, further, in violation of the Constitution, those other subjects were not expressed in the title. If they had been there expressed, the same taint of unconstitutionality would still linger because, since but one subject could be embraced in the bill, only one could be expressed in the title.

The conclusion which we have thus reached that chapter 657 of the Laws of 1900 was unconstitutional renders it unnecessary to discuss at any length the claim of the defendant that it supersedes *pro tanto* the provisions of the Greater New York Charter with respect to the consents of local authorities or property owners; or defendant's contention that said act in turn was not superseded by one (Laws of 1905, chap. 629) amending section 242 of said charter, which conferred upon the board of estimate and apportionment the exclusive power to grant franchises involving the occupation or use of any of the city streets. Since there was no express repeal of the charter provisions by the act of 1900, any superseding of them that was accomplished must have been by implication.

Section 1618 of the charter then, as now, provided that " this act or any section or provision thereof shall not be deemed to be repealed or amended by any act of the Legislature, unless it be so expressly stated, or the legislative intention to that effect is unmistakable." Clearly, it would take more than an amendment (which is all that the act of 1900 purported to be) to an act which expressly provided that it had no application to the city of New York to indicate an unmistakable intent to repeal the whole existing scheme of law in the charter which completely covered the rights of the city to its own streets. And, since after 1913 the defendant obtained its extensions pursuant to the amendment of the charter made by chapter 629 of the Laws of 1905, thereby accepting its benefits, it should not be heard to claim that chapter 657 of the Laws of 1900 (assuming it ever had any validity as a statute) was not superseded by chapter 629 of the Laws of 1905.

The defendant, however, seeks to maintain that the franchises in dispute were ratified and confirmed by chapter 466 of the Laws of 1901. That statute, which revised the Greater New York Charter, continued sections 71 to 74 thereof and sections 1458 to 1460, relating to franchises generally and to franchises or privileges for operation of stages and omnibuses, without material change except the substitution of the board of aldermen for the municipal assembly as the franchise-granting power; but amended section 1461 (which had simply prohibited the running of stages in the city except in conformity with the preceding sections) by adding thereto the following: " and no stage route shall after April first, nineteen hundred and one, be established or operated upon that portion of any street, avenue, road or highway in which a street surface railway or stage route is or shall be lawfully established, and in operation for a distance greater than one thousand feet, without first obtaining the consent of the corporation owning such railway or stage route, but nothing in this act shall be construed to affect the right possessed by any company to operate stage routes or extensions then established and in lawful operation, nor to affect any authority conferred upon any such company to acquire rights and privileges under chapter six hundred and fifty-seven of the laws of nineteen hundred, nor to affect any acts heretofore done thereunder."

Pursuant to the assumed authority conferred by chapter 657 of the Laws of 1900, the defendant had made written application in July, 1900, to the State Board of Railroad Commissioners for its approval of the extensions of route set forth in said application; it received the certificate of approval thereof from said Board in August, 1900, and filed its formal acceptance of the extensions

specified in said approval on August 4, 1900. After the passage of the act of 1901, defendant applied for like approval of further extensions, received a like certificate, and filed a like acceptance. When the operation of said extensions was commenced is not made to appear.

If chapter 657 of the Laws of 1900 was valid, nothing done under its authority needed any legislative confirmation or ratification. On the other hand, if, as we believe, it was invalid because unconstitutional, the court would not be justified in holding that the proviso or saving clause contained in section 1461 of the charter, as amended by the act of 1901, had the effect of rendering valid anything done under said unconstitutional statute. Such clause was not the recognition of any right or authority conferred by the prior act of 1900, because the latter, being unconstitutional, had conferred none. It was a mere saving of such right or authority as might have been conferred, if any. That was not sufficient to create the right or authority which the act of 1900, because unconstitutional, had failed to create. Neither was it sufficient to ratify or confirm illegal acts done under the void statute. Its language falls far short of indicating any such intention; and it was a case where plain words were necessary in order to effectuate such an intention, if it in fact existed. The purpose will not be assumed to have existed in the absence of terms in the statute indicating the existence of the purpose. Furthermore, it would be sad for the rights protected by the Constitution if, after they were violated, the Legislature could legalize such violation by ratification. Again, it is difficult to see how a statute which provides that it shall have no effect upon any rights or authority to acquire rights under another statute, or any acts done thereunder, can be a confirmation of any such rights or authority or acts.

The defendant cites no adjudicated case in support of its contention in this respect. If authority be needed for what we regard as the rather obvious conclusion that the act of 1901 was not a confirmation or ratification of anything that had been done or thereafter would be done pursuant to the act of 1900, support may be found by analogy in the following cases: *Smith* v. *Mayor, etc., of N. Y. City* (1 Hun, 56); *Kingsley* v. *City of Brooklyn* (78 N. Y. 200); *Matter of Trustees of Union College* (129 id. 308); *People ex rel. Hannan* v. *Board of Health* (153 id. 513).

The defendant further urges that plaintiff is estopped from questioning the validity of the act of 1900 and from seeking to enjoin the defendant from operating under the certificates issued pursuant thereto, because it has paid to the city large sums of money in license fees, taxes and charges for a number of years in

consequence of a failure of either side to take any proceedings to test the validity of the franchises.

It is a general principle, as defendant correctly claims, that a person or corporation accepting or claiming the benefit of a statute will not be heard to question its constitutionality; and this rule has been applied in exceptional cases to municipal corporations. (*Matter of City of Syracuse*, 224 N. Y. 201; *Matter of Hand Street*, 55 Hun, 132; *People ex rel. Lasher* v. *City of New York*, 134 App. Div. 75; affd., 198 N. Y. 439.) Yet we cannot hold that the conclusion follows which the defendant asks the court to adopt.

No estoppel was created against the city by the mere granting to defendant of the extensions, but, if at all, by their operation without objection on the part of the city and by its acceptance of the fees and charges paid by defendant as incident to such operation. The extensions claimed by the defendant were obtained in 1900, 1901 and 1912 in the manner provided by the act, but, as above stated, it does not appear when the actual operation of them was commenced. And in a submission of controversy no inference of fact can be drawn from the agreed statement of facts. Therefore, the date of the alleged estoppel of the city cannot be fixed, and the defendant's claim that it has existed for over thirty years is not sustained. The stipulated facts, however, are helpful, if not in fixing the date of commencement of operation, at least in fixing the date prior to which no estoppel on the part of the city can be predicated.

The act of 1900 required that the company obtaining extensions of its stage routes should pay to the city, in addition to the license fees already in force, five per cent of the gross receipts only " on operation of such extensions." The amount of license fees paid by defendant prior to 1902 is not shown by the record. For the years 1902, 1903, 1904 it shows that fifty buses were in operation. For the next four years the number appears to have been only thirty-six; the next two years, sixty, the next year, eighty, and in 1912, eighty-one buses. Allowing for normal increase of traffic over the original route, very little, if any, operation of the extensions can be claimed until after 1912.

In 1912 the corporation counsel delivered an opinion to the board of estimate and apportionment, at its request, that in view of chapter 657 of the Laws of 1900, enacting section 23 of the Transportation Corporations Law, and chapter 629 of the Laws of 1905, amending section 242 of the city charter, while a railroad corporation extending its route is required to obtain the consent of the local authorities, a stage coach corporation previously operat-

ing for five years is under no such obligation, and that relief from such an " anomaly " could only be obtained by legislation.

In 1913 the board of estimate and apportionment submitted to the corporation counsel certain questions with respect to the validity or invalidity of the extensions obtained by defendant under chapter 657 of the Laws of 1900. His reply is not in the record. In 1917 the number of buses appears to have been 162, double the number used in 1912; and the five per cent of gross receipts (which was about $350 less in 1907 than in 1902) had increased in 1917 by more than $66,000 over such percentage for 1913.

In 1917, in reply to the same questions as previously submitted by the board of estimate and apportionment, the corporation counsel rendered an opinion that the act of 1900 was unconstitutional, and that the extensions specified in the certificates granted under said act were invalid. The defendant was so notified and requested to apply for a proper franchise. The defendant declined to do so, but, as above noticed, no one until the present proceeding took any action to test the validity of the defendant's operations. From and after 1913, however, as above mentioned, defendant made its applications for further extensions to the board of estimate and apportionment (the procedure provided by chapter 695 of the Laws of 1905, amending section 242 of the charter), and not in pursuance of the act of 1900, as theretofore. This change of policy does not indicate reliance by defendant upon said act of 1900 after 1913.

Of the large sums of money expended by defendant, which it claims was in consequence of acquiescence of the city in its operations, by far the greater part thereof was subsequent to 1913, the date when the character of defendant's rights under the act of 1900 was first questioned by the city authorities, and the date on and after which defendant no longer invoked said act in obtaining further extensions. It is, therefore, apparent that the claimed acquiescence of the city cannot relate back prior to 1913. As in 1912 the city was questioning defendant's rights, and in 1913 the defendant abandoned reliance upon the act of 1900 for obtaining further extensions, and in 1917 the city definitely took the stand that defendant's operation under the act of 1900 was invalid and so notified the defendant, such acquiescence as there was during the four years from 1913 to 1917 could not amount to an estoppel. Thus the claimed acquiescence of the city for thirty-two years shrinks to at most four years, for from 1917 onward, though the defendant, being put upon notice, might have taken proceedings to protect its challenged right, none were instituted. The submission fails to show what part of the payments made to the

city throughout the entire period were on account of operation of the extensions here involved. As in 1913 they suddenly increased and kept increasing, it might be held, if speculation were permissible, that such increase was entirely due to the operation of the extensions obtained upon application to the board of estimate and apportionment, as undoubtedly a large portion of it was. But as even inference, let alone speculation, one way or the other is prohibited it should not be indulged, and to say that defendant paid any large sums on account of operation of the extensions obtained under the act of 1900 is wholly warrantable. The fact that defendant paid its taxes and other charges while profiting by the privileges unlawfully exercised cannot condone its failure to heed the warning of the plaintiff, given fifteen years ago, that it was without a proper franchise and should apply for one without undue delay, nor estop the plaintiff from receiving the relief which it now seeks.

We agree with the majority opinion in its conclusions adverse to defendant's contentions on the questions of *res adjudicata*, laches, limitations and estoppel.

This cause assumes unusual importance because the validity or non-validity of the franchise in question will have a vital bearing upon the present transportation conditions in the city of New York, particularly as modern conditions strongly suggest the substitution of bus transportation in place of street railways. The problem as a practical matter concerns the terms upon which the city shall agree with the transportation companies for the use of the city streets. No prejudice can be justly urged by the defendant, for it has had the benefit of the use of the streets of the city of New York for upwards of thirty years.

A corporation should not be permitted to profit by legislation which it alone could have been interested in securing and under which it alone claims rights in the New York city streets without just compensation and in disregard of the rights of the citizens. The people of the New York city should be protected against such subtle legislation and its results. Such legislation is neither fair nor just and should not meet with the approval of the court.

The plaintiff, therefore, in our opinion, is entitled to judgment as prayed for in the submission.

MARTIN, J., concurs.

Judgment directed for defendant in accordance with the prevailing opinion. Settle order on notice.